ÆTNA LIFE INS. CO. v. FRIERSON.

(Circuit Court of Appeals, Sixth Circuit. February 4, 1902.)

No. 988.

**1. ACCIDENT INSURANCE—CONSTRUCTION OF APPLICATION.**

A man being about to start for Seattle with the intention at the end of six months of going from there to Alaska on an exploring trip, applied to a soliciting agent of an insurance company for an accident policy, provided it would cover the risks incident to such trip. At the suggestion of the agent, two applications were filled out, one for an annual and one for a six-months policy, and sent on to the general agent of the company, together with a letter from the agent, fully explaining the matter, and that the applications were to be treated as in the alternative. Each application contained a clause that, "I have not in contemplation any special journey or undertaking except as herein stated." No other reference to a journey was made in the formal application. *Held*, that the letter accompanying them, and which was necessary to an understanding of them, must be regarded, as the parties intended, as a part of the application itself.

**2. SAME—WAIVER.**

An incorporated insurance company may waive conditions which are for its benefit, notwithstanding a provision that no waiver shall be valid, unless made in a prescribed way and by certain officials. Such a provision may be itself waived, as well as any other; the question in every such case being as to whether the waiver has been made by the corporation or one authorized to act for it in the matter.

**3. SAME—WAIVER BY RECEIPT OF PREMIUM.**

The receipt and retention of a premium at the "home office" of an accident insurance company, after knowledge of facts and circumstances which called upon the company to elect whether it would recall the policy or assume the risk of an extrahazardous journey contemplated by the assured, is an election to ratify the contract and continue the policy.

**4. SAME.**

A general agent of an accident insurance company, being fully advised by a letter accompanying an application that the applicant contemplated a journey not stated in the formal application, and desired the insurance only in case the policy would cover the risks of such journey, issued the policy, and forwarded it to the soliciting agent, who collected the premium and delivered the policy. A short time thereafter the general agent, by direction of the home office, wrote the local agent to withdraw the policy, but, the insured having gone away, this was not done, and the local agent later sent in the premium, which was received and retained by the company without objection. *Held*, that the company must be presumed to have been advised of all the facts shown by the letter prior to its directing the withdrawal of the policy, and that its subsequent action was a waiver of the right to invoke provisions of the formal application to avoid the policy on account of the journey.

**5. SAME—CONDITIONS—BREACH.**

A provision of an accident policy exempting the company from liability for injury sustained when the insured was engaged in "adventures

into wild and uninhabited or uncivilized regions" did not become operative because the insured had started on an exploring or prospecting journey into the interior of Alaska, where he was drowned in a storm while navigating a well-known bay on the seacoast, before he had entered upon the inland journey.

**6. SAME—CHANGE OF OCCUPATION.**

An insurance company cannot claim that an insured had changed his occupation from that stated in his application to that of a prospecting miner, which was one more hazardous, merely because he was, when he lost his life, on his way to Alaska, with the intention of engaging in such pursuit, when he had not entered upon it at the time of his death.

**7. SAME—AMOUNT OF RECOVERY—PASSENGER ON STEAM VESSEL.**

An insured under an accident policy which provided that, "if injured while riding as a passenger in any passenger conveyance using steam * * * as a motive power the amount to be paid shall be double that above specified," with others, formed a party for the purpose of ascending an Alaskan river and prospecting for gold in its vicinity. A steamship company contracted to furnish them with transportation to the coast of Alaska in one of its steamships, and from there in a river steamer, which they were to use as a base of supplies during their explorations, the company to receive as compensation one-half the profits of the expedition. After leaving the steamship, and while passing up the bay at the mouth of the river, the river steamer was wrecked, and the insured was drowned. *Held*, that he was a passenger, and the beneficiary was entitled to recover double the principal sum named in the policy.

In Error to the Circuit Court of the United States for the Eastern District of Tennessee.

This was an action on a policy of accident insurance. The insured was Robert P. Frierson. The loss, in case of death, was payable to the mother of the insured, who is the defendant in error. There was a stipulation waiving a jury and submitting the case to the court. The court rendered judgment for the plaintiff upon a special finding of facts, made a part of the record.

The company presented a number of defenses, which, so far as now material, were as follows: First. That the contract was void in consequence of a false statement in the application, in which the applicant stated, "I have not in contemplation any special journey nor hazardous undertaking, except as herein stated," whereas the applicant at the time contemplated a journey to the gold fields of Alaska for the purpose of prospecting for mines, and in fact did go to Alaska during the life of the policy, and was there drowned while prosecuting the journey to the gold fields in contemplation when he applied for insurance. Second. That the deceased at the time of his death was in violation of a condition of the policy which exempts the company from liability for injury sustained when the insured is engaged in "adventures into wild and uninhabited or uncivilized regions." Third. That the insured was placed in the preferred class as a lawyer. That he changed his occupation by going to Alaska as a "prospecting miner," and thereby rendered applicable the fourth condition of the policy, which is in these words: "If the insured is injured in any occupation or exposure classed by this company higher than the premium paid for this policy covers, the sum insured and weekly indemnity shall be only such amounts as said premium will purchase at the rate fixed for such increased hazard." Fourth. The policy insures the principal sum of $5,000, but provides for the payment of double that sum if the injuries from which death ensued "are sustained while riding as a passenger in any passenger conveyance using steam, cable, or electricity as a motive power." The company denied double liability under this clause, upon the ground that he was not at the time of his death a passenger in a passenger conveyance, within the meaning of this clause. The court below held upon the law and facts that the company was estopped from making the three defenses first mentioned, and that the de-

ceased was a passenger, within the meaning of the policy at the time of his death. There was, therefore, a judgment for double the principal sum insured, with interest from the date of the refusal of the company to pay. The application upon which the policy issued was made upon a printed form. All the written parts, except the signature, were filled in by the local agent of the company at Shelbyville, Tenn. The insured, Robert P. Frierson, was a lawyer living at Shelbyville.

The facts found by the court below in relation to the application for and issuance of this policy, as found by the court below, are as follows:

"(1) Robert P. Frierson, the insured, was a lawyer. On September 29, 1897, he applied to a soliciting agent of defendant at Shelbyville, Tennessee, for a policy of accident insurance, stating that he intended going in a few days to Seattle, Washington, where he would remain about six months, preparing and arranging for a speculative and prospecting trip into Alaska or the Klondike, prospecting for gold. He inquired of the agent whether defendant company would issue a policy to cover such a trip as he expected to take at the end of about six months. The agent, who had no authority to issue policies, replied that he did not know, but suggested that the way to ascertain was to send to the defendant company two applications, one for a six-months policy and the other for a twelve-months policy, and that he (the agent) would accompany them by a letter fully explaining the facts as to the proposed trip, and that the company could then determine for itself whether it would take the proposed risk, and, if not, could issue the policy for six months to cover the time assured would be in Seattle. Insured assented to this plan. The two applications were accordingly prepared and inclosed by the agent in a letter to Myron L. Long, manager of defendant company, at Cincinnati, to whom he forwarded all applications taken by him, fully explaining all the facts with respect to the stay in Seattle, and the proposed speculative and prospecting trip to Alaska or the Klondike, and that a policy for twelve months was wanted only in the event it would cover the risk of the latter trip.

"(2) Upon receipt of this letter, and with a full knowledge of the facts that, unless the insurance would cover the risk of a speculative or prospecting trip to the Klondike, a policy for only six months was desired, the manager of defendant company, at Cincinnati, Ohio, dating it September 29, 1897, mailed the policy to the agent at Shelbyville, and about October 13, 1897, forwarded the application to the home office of defendant company at Hartford, Connecticut. Upon receipt of the policy the agent mailed it to the insured, who had then gone to Seattle, and collected the premium of twenty-five dollars ($25.00), which had been left by the insured at Shelbyville for that purpose.

"(3) On October 9, 1897, the manager at Cincinnati wrote the agent at Shelbyville, as follows: 'I regret the ordering up of the policy of Robert P. Frierson. We have written him a policy for $5,000, dated September 29th, for five months. You can advise him that policy is in full force and effect, and will be mailed you immediately upon receipt of return of the other policy. I tried my best to favor you in this matter, and regret my inability to do so.' Insured was then in Seattle, and the agent did not in any way communicate with him, the beneficiary, or any one connected with either of them, the fact that the policy had been ordered up. Subsequently, and in due course of business, the agent remitted the full premium for twelve months to the manager at Cincinnati, who received it without objection, and remitted it to the chief office at Hartford, where it was received and retained. No further effort was made to cancel the policy."

In respect to the questions as to whether the assured was engaged in "adventures into wild and uninhabited or uncivilized regions," or was a "passenger in any passenger conveyance using steam, etc.," at the time of his injury, there was no specific finding of fact. The facts bearing upon both these questions, as found by the court below, constitute the sixth finding of fact, and is as follows: "Insured remained in Seattle until May 31, 1898, preparing for the proposed trip. He and a number of other young men organized a party for the purpose of ascending the Kuskokwim river in Alaska,

and prospecting the interior of Alaska or the Klondike for gold. They arranged with the Columbia Navigation Company, a common carrier, engaged in the carriage of passengers by water from Seattle to Alaska, for transportation. The relation of the party to the company is found to be as stated by Richard Chilcott, president of that company, and R. P. Camdon, stockholder and officer in the company, which the court here restates and adopts in the language of the witness. Chilcott says: 'Q. What compensation was the Columbia Navigation Company to receive for transporting the party from Seattle to Kuskokwim Bay and thence up the Kuskokwim river? A. It was to receive one-half of what the party realized in two years.' Cross-examination: 'Q. Who furnished the general stores for this party? A. I did, or the Columbia Navigation Company. When I use the personal pronoun, I am merely speaking of my company. Q. The twelve or more men you sent up there were to operate the boat and do all the other work? A. Yes. Q. They were crew and everything else? A. Yes.' Recross-examination: 'Q. Captain, were the members of the Jessie party at expense themselves in making this expedition? A. They contributed one thousand dollars each towards their supplies, but they paid no passage money. They were to pay from the proceeds of the expedition. Q. You testified, I believe, that the proceeds were to be divided half and half between your company and the individuals? A. Yes, sir. Q. Did any person on the Jessie pay fare? A. Yes, a man named Anrud. Q. Was he the only passenger from Seattle? A. Yes, with the exception of the party named. Q. This party also manned the boat? A. No. Q. You mean she was manned by others outside of the party? A. No, they were inside the party, but they were men on pay. Q. State, if you can, the names of the party on pay who manned the boat. A. Kinsler, Hare, Knudsen, and the Jap cook. Q. Who furnished the steamer Jessie for the purpose of transporting the party up the Kuskokwim river? A. The Columbia Navigation Company. Q. State fully, if you know, what instructions were given to this party with respect to communicating with the Columbia Navigation Company after they should reach Alaska. A. Each member was given a pass over all the boats of the company, and, in case any of them at any time crossed over to the Yukon river, they had the right to take the river boats up or down, and it was through these river boats that they were expected to communicate. Q. What compensation was the Columbia Navigation Company to receive for transporting the party from Seattle to Kuskokwim Bay, and thence up the Kuskokwim river? A. The Columbia Navigation Company was to get half the profits of the expedition. Q. State whether the members of this party were all, or most of them, and particularly if Robert P. Frierson was a stockholder in the Columbia Navigation Company. A. Nearly all of the party were stockholders of the Columbia Navigation Company.' Cross-examination: 'Q. You have stated that the Columbia Navigation Company was to share profits with this party. Did this party charter the steamer Jessie, giving as a price one-half of the profits of the expedition? A. No, sir; there was nothing in the way of a charter. Q. Did these fourteen names you gave us constitute the entire party which was to go on the Jessie? A. Yes, sir, with the exception that they knew that they would have to put on a pilot. Q. Then, if I understand you, the party of fourteen which left Seattle were to go up Kuskokwim river on the steamer Jessie, and the consideration moving to the navigation company was half of the profits of the expedition? A. Yes, sir; half to the navigation company and half to them. Q. At what time was the Columbia Navigation Company entitled to call for their half of the profits of the expedition? A. At any time. Q. Within the two years or later? A. Well, there was no agreement made as to that, but the understanding was they were to have our half interest in any profits. Q. That is to say, the Columbia Navigation Company assisted this party of fourteen to ascend the river a thousand miles or more to look after gold, and they were to give the Columbia Navigation Company one-half the gold which they found in consideration of the supplying the boat and provisions for the period of two years, and the other half of the gold found was to be divided equally between the party? A. That is right so far as it applies to the gold; but the party expected to find a town site, and, of course, they would simply be

deeded their one-half interest.' For the purpose of this expedition the company built a river steamer known as the Jessie. She was stocked with provisions sufficient to last two years, and was to remain with the party, and be used as the base of supplies while they were prospecting. The Jessie and the party who were to ascend the Kuskokwim river were transported on the Lackme, an ocean steamer belonging to the Columbia Navigation Company, from Seattle to a point near Kuskokwim Bay. On June 27 or 28, 1898, the Jessie was launched off Kuskokwim Bay, and started on her journey, manned by the crew, who were in the pay of the company; that is, the Columbia Navigation Company. In addition to assured and his party, whose passage was to be paid for by a share in the profits of the expedition, she carried one passenger, who paid a regular fare, and another, who paid the fare for himself and wife and child by his services as guide and pilot. The Kuskokwim river had not been previously navigated by steamboats. The region traversed by it is sparsely inhabited by Indians of a low degree of civilization, together with a few white missionaries at one point about two miles from its mouth, and traders."

Further facts essential to the determination of the questions arising upon the errors assigned will appear in the opinion.

W. B. Stephens and W. D. Carswell (Lewis Sperry, of counsel), for plaintiff in error.

Shepherd & Frierson, for defendant in error.

Before LURTON and DAY, Circuit Judges, and WANTY, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

For the company it is said: (1) That the consideration upon which the policy issued was the premium paid and "the warranties made in the application." (2) That the statement in the application that "I have not in contemplation any special journey or hazardous undertaking, except as herein stated," constituted a warranty, the breach of which was not waived as a consequence of the facts communicated by the assured to either the soliciting agent at Shelbyville or the company's "manager" at Cincinnati. (3) That the conceded fact that the insured lost his life while upon a "special journey" and "hazardous undertaking," which he had in contemplation when he made his application, constitutes a breach of the warranty, and defeats the policy.

Among the conditions made a part of the policy is this:

"No agent has authority to waive any condition of this policy; and no waiver will be recognized unless in writing, signed by either the president, vice president, secretary, or assistant secretary of the company."

It may be conceded that a contract of insurance in writing, if in unambiguous terms, must speak for itself, and cannot be altered or contradicted by parol evidence, in the absence of fraud or mistake. This ancient rule has been lately applied in respect of a fire insurance policy which was held void in consequence of the existence of other insurance at inception of contract, because consent to same was not indorsed thereon, although the fact of its existence was communicated by the assured to the company's agent before the policy was delivered. Northern Assur. Co. v. Grand View Bldg. Ass'n, 22 Sup. Ct. 133, 46 L. Ed. ——. In that case the policy provided that it should be "void if the assured now has or shall hereafter make or procure any other contract of insurance," etc., unless otherwise provided by agreement

"*indorsed hereon or added hereto.*" The policy also provided that no officer or agent of the company "shall have power to waive any provision or condition of this policy except such as by the terms of this policy may be the subject of agreement indorsed hereon or added hereto, and as to such provisions or conditions *unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or remission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached.*" We have underscored certain parts of the policy there involved for the purpose of calling attention to the specific character of the agreement sought in that case to be avoided by evidence tending to show knowledge of other existing insurance by the agent who issued the policy. If the defendant in error had rested her case upon an estoppel arising from the mere fact that the soliciting agent who received and forwarded these applications knew the truth as to the purposes of the applicant, the case, in that aspect of it, would, perhaps, be controlled by the case last cited. But we think the facts of the case are such as to distinguish it from Northern Assur. Co. v. Grand View Bldg. Ass'n. The statement relied upon as constituting an untruthful representation of the purposes of the applicant indicates upon its face that it was accompanied by some other statement upon the same subject. It reads thus: "I have not in contemplation any special journey or undertaking, except as herein stated." To what do the words "as herein stated" refer? No journey or undertaking was "herein stated" unless the statement which the parties agreed should accompany Frierson's applications is to be regarded as constituting a part of the application upon which the policy issued. The facts found by the court below were that two applications were made at the same time, one for a six-months policy and the other for an annual policy. The latter was desired only in case the policy would cover a trip such as he expected to make. The soliciting agent agreed to accompany these applications with "a letter fully explaining the facts as to the proposed trip." This the agent did. Upon this accompanying part of the application the general agent acted. Clearly, this statement accompanying the applications must be regarded, as both parties then intended, as a part of the application itself. The letter and the formal application should be regarded as together constituting one document. Greenl. Ev. § 283; Lee v. Dick, 10 Pet. 482, 493, 9 L. Ed. 503; Bell v. Bruen, 1 How. 169, 183, 11 L. Ed. 89.

The question is not, therefore, one of waiver; for, if the letter of the soliciting agent constituted a part of the written application for the policy upon which the policy was issued, there has been no breach of the warranty to be waived, the application truly stating the purpose of the applicant to take the very journey in course of which he met his death. But if we assume that the communication which accompanied the two applications is not to be regarded as a part of the application upon which the policy in suit issued, it is, nevertheless, operative as notice to all of the agents and officers of the company who saw it or learned of it that the applicant did contemplate the journey and enterprise in course of which he met his death, and that he had not applied for two policies of insurance, but for the annual policy if the company should consent to issue it in view of his purposes, and for

the shorter one only if it declined the risk of his contemplated journey. If the Cincinnati agent who received this communication and issued the annual policy, with all the light which that document gave him, had been himself the insurer, there could be no possible doubt of his authority to bind himself, and to waive any and every condition of the policy made for his benefit. So, too, it is not to be doubted that an incorporated insurer may waive any condition intended for its protection, even though it has prescribed that such waiver must be in writing; for it may as well waive such a condition as any other. This power of an insurance company to waive any provision or condition solely for its own benefit was affirmed in Insurance Co. v. Wolff, 95 U. S. 326, 24 L. Ed. 387, and Insurance Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689. However much those decisions may be regarded as doubted by Northern Assur. Co. v. Grand View Bldg. Ass'n, the doubt does not extend to the question of the power of an insurance company to waive any provision or condition of the policy intended for its protection. "As to this proposition," said Justice Shiras, in the case last cited, "there was, and could have been, no disagreement among the judges, but the difference arose over the sufficiency of the evidence to show the waiver." The question we must, then, meet in this aspect of the case is one of the evidence relied upon to establish that the company issued this policy with knowledge that the statement in the formal application relied upon as a warranty had been inserted by its own agent under an agreement with the applicant that he would forward therewith a full statement as to the journey and enterprise which the applicant had in view. For the purposes of this case we shall assume that the manager at Cincinnati, who received the two applications and the soliciting agent's accompanying communication, did not and could not waive the condition of the policy in respect to any breach resulting from any misrepresentation in the application. The court found that on October 2, 1897, this managing agent issued the policy now in suit, dating it September 27, 1897. On October 9, 1897, he wrote this Shelbyville agent, to whom the policy had been sent, and by whom it had been delivered to the assured, as follows:

"I regret the ordering up of the policy of Robert P. Frierson. We have written him a policy for $5,000, dated September 29th, for five months. You can advise him that that policy is in full force and effect, and will be mailed you immediately upon receipt or return of the other policy. I tried my best to favor you in this matter, and regret my inability to do so."

This act was the act of the company, and the plain inference, in the absence of explanation, is that the company had disapproved the issuance of this policy in view of the knowledge communicated to its home office through the letter of the local agent which had accompanied the application. It is true that at another point in the finding of facts it is stated that this manager had, "about October 13, 1897," forwarded the application to the home office of defendant company at Hartford, Connecticut. The date, "about October 13th," is probably a mistake, as every inference is that the home office received the application and accompanying communication prior to the direction to cancel the policy, which undoubtedly emanated from the "home office." The company could have made plain just when the home office received

these applications, and just why the cancellation of the policy was directed. Its silence justifies the presumption that the direction to recall the policy came from the managing officers of the company, and that it was due to an unwillingness to accept the risk incident to the contemplated journey of the assured, and therefore preferred to issue to him the short policy which he had applied for as an alternative. The agent did not communicate with the assured, and withdraw the annual policy, as directed. Upon the contrary he, "in due course of business," "remitted the full premium for twelve months to the manager at Cincinnati, who received it without objection, and remitted it to the chief officer at Hartford, where it was received and retained." "No further effort was made to cancel the policy." The proposal submitted by the assured to accept an annual policy, provided it would cover his contemplated journey, was accepted by the company's agent, and the act of this agent, when submitted to the company, was ratified by the receipt and retention of the premium with full knowledge of all the facts.

In Northern Assur. Co. v. Grand View Bldg. Ass'n, cited above, it is said to be sustained by all the authorities "that, when waiver is relied on, the plaintiff must show that the company, with knowledge of the facts that occasioned the forfeiture, dispensed with the observance of the condition; that, when the waiver relied on is an act of an agent, it must be shown either that the agent had express authority from the company to take the waiver, or that the company subsequently, with knowledge of the facts, ratified the action of the agent." The receipt and retention of the premium at the home office of the company, after determining to recall the policy because unwilling to take the risk incident to the journey and business contemplated by the assured, was a distinct election to ratify the contract and continue the policy. Insurance Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689; Insurance Co. v. Wolff, 95 U. S. 326, 24 L. Ed. 387; Madden v. Brown, 97 Mass. 148; Kirkpatrick v. Insurance Co., 11 App. Cas. 177; North Berwick Co. v. New England F. & M. Ins. Co., 52 Me. 336; Miner v. Insurance Co., 27 Wis. 693, 9 Am. Rep. 479. In Madden v. Brown, cited above, Judge Gray, speaking for the court, said:

"Although an agent of the company had no authority to bind them by receiving payment of a premium note after it was due, the company might receive such payment at any time. If they received the amount of the note from their agent after it was due, they were bound to inform themselves of the time when it had been paid to him; and by receiving it from him without inquiry they waived the right to insist on the delay in the payment as a ground of forfeiture of the policy."

This waiver, being the act of those officials constituting the "home office," was the act of the corporation. The fact that the premium was received and retained with knowledge of the facts constitutes in itself a waiver of the right to rely upon the known breach of the condition of the policy. It was likewise a waiver of the stipulation of the policy that "no waiver will be recognized unless in writing, signed by either the president, vice president, secretary, or assistant secretary." It was just as competent for the company to dispense with the observance of this condition, being one made for its own benefit, as any other. Mutual Reserve Fund Life Ass'n v. Cleveland Woolen Mills,

54 U. S. A. 291, 27 C. C. A. 212, 82 Fed. 508; Insurance Co. v. Mc-Crea, 8 Lea, 513, 41 Am. Rep. 647; Pechner v. Insurance Co., 65 N. Y. 195; Insurance Co. v. Earle, 33 Mich. 143; Dilleber v. Insurance Co., 76 N. Y. 567. In Mutual Reserve Fund Life Ass'n v. Cleveland Woolen Mills, cited above, this court said:

"Neither is it competent for the parties to disqualify themselves from ability to agree by parol to any contract which, under the law, need not be in writing; and an agreement in the terms of a policy that no change or alteration thereof shall be valid unless in writing, indorsed thereon, may it-self be changed by parol."

In Northern Assur. Co. v. Grand View Building Ass'n, there is nothing in conflict with this. The court there upheld a provision in the policy which required consent to other insurance to be indorsed thereon in writing by the agent issuing the policy. The waiver then relied on was waiver resulting from the mere knowledge of the agent that such other insurance existed at the time he issued the policy.

2. What we have said applies as well to the defense that the assured lost his life through "adventures into wild, uninhabited, or uncivilized regions." The assured lost his life by a storm while a passenger on board a steam vessel called the Jessie, belonging to the Columbia Navigation Company, while crossing Kuskokwim Bay, a bay on the coast of Alaska, for the purpose of ascending the Kuskokwim river, one of the rivers of Alaska. He, with others, had been carried from Seattle as passengers upon an ocean steamer to a point off Kuskokwim Bay, where they took the Jessie for the purpose of continuing a journey to the gold fields of Alaska. The journey was not completed which the company knew he had in contemplation. It cannot be said that he was, at the time of his death, engaged in adventures in a wild, uncivilized region. He was crossing a well-known arm of the sea, and had not reached the river which it was proposed to ascend. His adventure in a wild and uncivilized region—if that may be regarded as a proper characterization of the mining regions of Alaska—had not begun.

3. The fourth condition of the policy was in these words:

"If the insured is injured in any occupation or exposure classed by this company higher than the premium paid for this policy covers, the sum insured and weekly indemnity shall be only such amounts as said premium will purchase at the rate fixed for such increased hazard."

The contention is that the insured had changed his occupation from that of a lawyer, as stated in the application, to that of a "prospector miner." But there are no facts upon which to base this defense. If the assured had lived to begin his work of prospecting for mines, there might be some room for the contention now made. That he intended to engage in "prospect mining" is not enough. To bring this provision of the policy into effect, the company must show that he was actually engaged in an occupation, at the time he sustained his injury, "classed higher than the premium paid for the policy covers." This the company has not done, for it is clear that he lost his life in a storm while a passenger on a steamer crossing the Kuskokwim Bay for the purpose of going up the Kuskokwim river, and thus into the interior of Alaska. The journey which he contemplated when he applied for insurance, and about which he informed the company through the com-

munication accompanying his application as a part thereof, had not been completed when he met his death. This defense was properly held to be unavailing by the court below.

4. It is next assigned as error that the court allowed a recovery for double the sum named as the principal sum insured. Clause "f" of the policy is in these words:

"If such injuries are sustained while riding as a passenger in any passenger conveyance using steam, cable, or electricity as a motive power, the amount to be paid shall be double the sum above specified."

There is no specific finding that the assured was a passenger at the time of his death, but the court adopted as its finding the facts testified to by Richard Chilcott, president of the Columbia Navigation Company. There was no specific finding that the assured was riding as a passenger in a passenger conveyance at the time of his death. The court, however, did find certain facts which tended to show what his relation was to the owner and navigator of the steam vessel upon which he was traveling. These facts have been elsewhere set out in full. Upon this finding of facts the court below held that the assured was a passenger, within the meaning of the double indemnity clause of the policy. While some of the persons composing the party, of whom Frierson was a member, did constitute the crew employed and paid by the navigation company to navigate the steamer, Frierson was not one so paid. He owed no duty to the navigation company in respect to the navigation of the Jessie. The agreement of the navigation company, so far as it involved the transportation of Frierson from Seattle up the Kuskokwim river, created the relation of carrier and passenger. There were other parts of the contract, by which the Jessie was to be used as a base of supplies up the river, which do not affect the carrier agreement one way or the other. The Jessie at all times continued to be under the control and management of the navigation company. The Frierson party had no exclusive rights, for she was under no charter, and she had on board a passenger who had paid a separate fare, not being a member of the Frierson party, nor within the terms of the contract under which he was being carried. The Jessie was a passenger conveyance, whose motive power was steam. Frierson was not at the time a servant, or in the employment of the owners or navigators of the Jessie. He was riding on the boat under a contract based upon a good consideration, by which the Columbia Navigation Company undertook to carry him up the Kuskokwim river. These facts constitute him a passenger. Wood, Ry. Law, § 298. The fact that the Jessie was to remain up the river, and be used as a base of supplies for exploring or mining parties, does not affect the carrier agreement which was being executed when the Jessie was wrecked. That for the service in carrying his party up the river and for the subsequent use of the boat as a warehouse or place of shelter the navigation company was to receive a definite share in the results of the expedition does not change the carrier relationship which existed while the journey was in progress. There was no partnership or charter relation in the ownership or navigation of the steamer. The counsel for defendant in error has cited and relied upon a class of cases holding that employés of railroad companies, while being carried to and from

114 F.—5

their work, are not passengers, but employés. The cases relied on are cited and approved by this court in Railroad Co. v. Stuber, 48 C. C. A. 149, 108 Fed. 934. They have no possible application to the case at bar, for the reason that the assured was not an employé of the navigation company. That the Jessie was not "a public conveyance in the usual lines of travel as a common carrier of passengers" may be true. But, if the insurance company intended to limit the benefits of its contract to passengers who travel "in conveyances operated in the usual lines of travel as common carriers," it should have so stipulated. This it did not do.

The judgment must be affirmed.